## In re WRIGHT-DANA HARDWARE CO.

### Petition of CANTWELL.

(District Court, N. D. New York. October 23, 1912.)

1. EVIDENCE (§ 471*)—WITNESSES (§ 240*)—EXAMINATION OF WITNESS—LEADING QUESTIONS—CONCLUSION.

On an issue as to whether certain paint returned by a bankrupt to claimant had been sold to the bankrupt or was on consignment, a salesman of the bankrupt was asked, "That the stock of paint then was taken

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes.

by inventory and payment was then made to W. Paint Company; that is, the proceeds of the sales, for the previous year were turned over to the W. Paint Company less commission?" *Held*, that such question was leading, suggestive, and objectionable as calling for a conclusion.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 2149–2185; Dec. Dig. § 471;* Witnesses, Cent. Dig. §§ 795, 837–839, 841–845, 849–851; Dec. Dig. § 240.*]

2. BANKRUPTCY (§ 340*)—CLAIMS—EVIDENCE—RELEVANCY.

On an issue as to whether certain paint returned by a bankrupt to claimant was sold or on consignment, evidence that when claimant's agent came to remove the same he was referred to the bankrupt's attorneys by a mere servant of the bankrupt, and after consulting with them they consented that the paint should be removed, and told him that he had a right to remove it, was incompetent and immaterial; the bankrupt's attorneys having no authority to permit such removal, or determine the question.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 527; Dec. Dig. § 340.*]

In the matter of bankruptcy proceedings of the Wright-Dana Hardware Company. Application to review referee's order dismissing the petition of John A. Cantwell, as trustee, to expunge the claim of the Warren Paint Company, on the ground that it was too great, and that plaintiff had received preferences from the bankrupt and had not surrendered the same. Referee's order reversed, and cause returned for new trial.

Charles B. Mason, of Utica, N. Y., for claimant.

Martin & Jones, of Utica, N. Y., for trustee.

RAY, District Judge. The petition in bankruptcy was filed against the Wright-Dana Hardware Company on the 17th day of January, 1912, and adjudication was made on the 5th day of February, 1912. On the 27th day of February, 1912, John A. Cantwell was duly appointed trustee and he duly qualified.

April 26, 1912, Warren Paint Company, of Warren, Ohio, a corporation of that state, filed its claim on four promissory notes, viz.: One dated March 22, 1911, for $500, due in six months; one dated October 23, 1911, for $400, due in four months; one dated November 22, 1911, for $600, due in four months; and one dated December 22, 1911, for $400, due in four months—and for balance claimed to be due on open account, $1,796.42.

The trustee filed his petition for the disallowance and expurgation of said claim, on the ground the Warren Paint Company had received preferences during the months of January and February, 1912, and particularly on the 5th and 6th days of February, 1912, and had not surrendered such preferences. On the 5th day of February, 1912, the same day the adjudication was made, the Warren Paint Company by its agent or representative, and with knowledge of the bankruptcy proceedings and adjudication, entered the store and place of business of Wright-Dana Hardware Company, and with the acquiescence of the person there in charge, but without any action on the part of that company, as such, took possession of and carried away paint to the value

of $1,766.80. The claim of the Warren Paint Company was and is that this paint was its own property, which it had sent to the Wright-Dana Hardware Company on consignment for sale by that company as agent of the Warren Paint Company, the said Hardware Company to pay over the proceeds of such sales, retaining a commission for doing the business, and that the bankrupt company had no other interest in such paint. The claim and contention of the trustee was and is that such paint was sold to the Wright-Dana Hardware Company and was its property, and that by taking and removing the paint as it did the Warren Paint Company received a preference.

The real question is: Who owned the paint so removed? There are facts and circumstances pointing to ownership in the Wright-Dana Hardware Company, and others pointing to ownership in the Warren Paint Company. The referee has made some 25 findings of special facts, but some of them have no support whatever in the evidence. The claimant, Warren Paint Company, claims that there was a written contract between the parties as to this paint, by the terms of which the Warren Paint Company was to send same on consignment to the Wright-Dana Hardware Company, expressly retaining title and ownership, for sale, the proceeds of such sale, after deducting commission, to be the property of said Warren Paint Company and immediately remitted to it, the paint to be insured in the name and for the benefit of said Warren Paint Company. This written agreement was not produced, and the claim is that it has been lost since the paint was taken by the Warren Paint Company. A written contract between the parties relating to the sale of paints for the Warren Paint Company by the Wright-Dana Hardware Company, made January 1, 1906, was produced and put in evidence, and evidence was given that the contract in force when the paints in question were sent to the said Hardware Company was substantially identical, except in certain unimportant particulars. That agreement contained the provision:

"The party of the first part [Warren Paint Company] agrees to insure in their own name the stock of paint consigned, and the party of the second part [Wright-Dana Hardware Company] shall not be responsible for any loss or damage by fire to said stock."

The closing clause of such contract reads:

"The goods *sold at net prices* are marked in red ink in the price list of 1906, and forms a part of this contract."

By the first clause it is provided that:

"The party of the first part hereby agrees to give the party of the second part the exclusive agency or sale of their goods from January 1, 1906, to December 31, 1906, upon all territory"

—specifying territory. It also contains the following:

"Each party to this contract is to keep on their ledgers two accounts, one known as the personal account and the other as the consignment or stock account. All consigned goods to be billed at the regular dealer's price, as shown upon the price list and discount sheet of 1906, of the Warren Paint Company, and to be f. o. b. Utica, N. Y. All goods not so consigned are to be at net prices as agreed upon by the parties hereto and to be f. o. b. Warren, Ohio. The second party is to store the goods and take care of the

same, to receive and ship all goods without any extra charge. Upon all consigned goods that are sold by the Wright-Dana Hdw. Co., or their agents, the following commissions are to be allowed: Upon outside and inside White, 15%: upon all other goods other than net goods, a discount of 20% is to be allowed. The second party have the right, upon the 15th of each month, to settle for all goods that have been sold during the month previous, and receive therefor an extra discount of 3% upon all such payments. * * * An invoice is to be taken at the close of each year, and whatever shortage or deficiency may appear the second party is to settle for upon the terms stated above."

The officers of the Wright-Dana Hardware Company testified in substance that they did not understand they were purchasing the goods, but receiving them on consignment to sell for the Warren Paint Company on commission. The Wright-Dana Hardware Company did not keep the proceeds of the sales of paints received under the contract, if it existed as claimed, separate or distinct from its own funds, and did not keep any account of sales made. It put the money with its own moneys, and used it as its own money, and no objection was made by the Warren Paint Company. At long intervals account of paints sold was got at by counting up stock received and stock not on hand, and figuring the value, deducting commissions, and the Warren Paint Company took notes for the amount due. The notes in question were given for the sums found due at the dates of such notes, respectively. Some payments were made on account from time to time. This mode of dealing was, of course, wholly inconsistent with the existence of such a contract as is claimed, and with ownership of the paints by the Warren Paint Company.

The referee finds as follows:

"That the proceeds of the sale of the Warren paint were put into the general funds of the store of the bankrupt and were subsequently turned over by the bankrupt to the Warren Paint Company. That it was not a practical thing in the business of the bankrupt to keep a separate account of the sales made of the Warren paint."

These findings of fact are not only unsupported by evidence, but are contrary to the evidence. The paint was not mixed with other paints, and when any of it was sold it was not only easy, but perfectly practicable, to make an account of it in a separate book or in a separate account. While it is true that the (now) bankrupt company put the proceeds of the sales of this paint into the general funds of the store, and also used such proceeds as its own, it did not subsequently turn them over to the Warren Paint Company, except in part, making payments on account. The notes to which attention has been called were given for moneys due the Warren Paint Company for such paints sold by said company, and which paints had been received under the alleged agreement. The evidence shows, conceding payments on account to be a subsequent turning over of the proceeds of sales, that much the greater part of such proceeds were never turned over. If the contract existed as claimed, and the paints belonged to the Warren Paint Company, as there was no agreement to loan such proceeds, the Wright-Dana Hardware Company continually converted such money to its own use, and the Warren Paint Company from time to time

waived the tort by taking payments on account, and especially by taking notes. There is no evidence it charged any interest on the money so used by the (now) bankrupt company.

Up to April 29, 1911, all paints shipped to the Wright-Dana Hardware Company were billed as follows, and accounts sent, viz.:

"The Warren Paint Co., Paint and Color Manufacturers, Warren, Ohio. Sold to Wright-Dana Hardware Co., Utica, N. Y."

Then followed list of paints, with quantity, price, and amount, date shipped, name of the salesman, and "Terms, 60 (days meaning) 2 % 15 days," meaning that price was, as stated, payable in 60 days. After April 29, 1911, the paints were billed in same way, except that "Terms" had "on consignment" in place of the time, etc., just mentioned. April 5, 1911, the Wright-Dana Company wrote M. S. Clapp, secretary of the Warren Paint Company, as follows:

"We have written the factory that we want to return $1,000 worth of Chi Namel, stating that we carried this large amount when we were wholesaling the goods for them, and that when they closed off our jobbing proposition it was unfair to expect us to carry $1,500 worth of Chi Namel. To be absolutely frank in this matter, we are precious hard up, as Mr. Dana probably told you. This he would not put on paper to any other man in the world, excepting M. S. Clapp; but it is, nevertheless, a fact, and one which bothers the writer considerable. Now I want you to use your influence with Ford to take back $1,000 worth of Chi Namel, and I want, also, to have it apply on the account which we owe you. This can be done, as the Ohio Varnish Co. must have an account with the Warren Paint Co., whereby they owe the Warren Paint Co. money, and can this way return the account. We shall still continue to buy paint and Chi Namel, and in fact have in a window this week in which we are advertising the goods, and when the weather is a little warmer we want a demonstration. We shall expect you to consider this matter seriously, and do not say no. We know you can arrange it with Ford, if you want to. There is no question about that."

It was immediately after the receipt of this letter that the Warren Paint Company put the words "on consignment" into the bills. June 26, 1911, Mr. Clapp, as secretary, wrote the bankrupt company:

"Another thing: I wish you would immediately ship all of the goods that are to come back here, so that we can make a final adjustment. Yet you understand, as we are not keeping the account, as per our former letter, we regard all of the shipments that have been made to you and all the goods that you retain as being on consignment, but that should not prevent you making payment as we talked when last there, that you would pay every 60 days as bills became due, thereby reducing all the time the indebtedness, instead of allowing it to grow and become large. No doubt the plan under which you are working is the best thing for you. Send all the goods at once that are coming here."

August 14, 1911, the Warren Paint Company, per M. S. Clapp, also wrote:

"I wish you would commence sending us checks along as you can to reduce this account, as it was the understanding, you know, between us, that you were to pay for this year's goods upon regular terms."

"Regular terms" were cash in 60 days, 2 per cent. off if paid in 15 days.

September 22, 1911, the Warren Paint Company also wrote and sent the following letter:

"We find that you are ordering a good deal of paint shipped to you from Buffalo. The understanding was that you were to pay for all of the goods

that you ordered this year, and up to the present time we have received no remittance covering any of the shipments that have been made, and we must ask that you send us remittance for all that is 60 days old. While it is true that we have billed these goods to you as of consignment, yet that does not change your own proposition that you would pay for the goods upon regular terms. Kindly do this by sending us a check by return mail."

The last bill of goods sent was shipped November 18, 1911, and amounted to $14.85. January 1, 1912, the Warren Paint Company sent a bill as follows:

Warren, Ohio, January 1, 1912.

Wright-Dana Hardware Co., Utica, N. Y., to the Warren Paint Company, Dr.

| Debit | | Credit | |
|---|---|---|---|
| Dec. 1. Balance | $3,515 24 | Dec. 20. C. M. | $ 3 09 |
| Jan. 1. Balance | $3,512 15. | Balance | 3,512 15 |
| | | | $3,515 24 |

All these facts and letters are inconsistent with any theory that the Warren Paint Company had sent these goods on consignment and that the title thereto was in the Paint Company. The statement of account is inconsistent with the claim that these goods were sent and sold on consignment. It appears from the evidence, uncontradicted, that the (now) bankrupt company sold the paints on a commission on the price at which billed to it, but that at retail—and nearly all sales were at retail—at an advance of 25 per cent. or such as it could get, and that when settlements were made a discount of 10 per cent. on the invoice prices was allowed.

It would seem quite clear, but for the testimony of Samuel Bennett, salesman of Wright-Dana Hardware Company, and Arthur J. Lowrey, treasurer of said company, that there was an agreement of sale and purchase, a regular shipment and billing of the goods on that theory, and payments and demands of payment on that basis, and a use of the proceeds of sales as made on the theory that the paints and proceeds of same were the property of the Wright-Dana Hardware Company. The words "on consignment" were inserted after the said Hardware Company stated it was very hard up. But it is a fair inference from the letters of the Warren Paint Company that it relied on some other agreement—one by which the Wright-Dana Hardware Company was to take the paints at the prices named and pay for them on "regular terms," for June 26th, it wrote:

"But that should not prevent you making payment as we talked when last there, that you would pay every 60 days as bills became due, thereby reducing all the time the indebtedness, instead of allowing it to grow and become large."

It is now claimed by Lowrey that this agreement referred to the unpaid notes. But the notes were not 60-day notes and the subsequent letters say—September 22, 1911:

"The understanding was that you were to pay for all of the goods that you ordered this year, and up to the present time we have received no re-

mittance from you covering any of the shipments that have been made, and we must ask that you send us remittance for all that is 60 days old."

And August 14th:

"I wish you would commence sending us checks along as you can to reduce this account, as it was the understanding, you know, between us that you were to pay for this year's goods upon regular terms."

So far as appears, the now bankrupt company did not repudiate or question these statements, but made payments on account. It is, of course, true that the Warren Paint Company could not make a contract by writing the Wright-Dana Hardware Company that one had been made between them according to terms stated; but it might conclude itself, as between itself and the trustee in bankruptcy, from disclaiming the contract as stated by it in writing on at least three different occasions.

Turning to the testimony of Mr. Bennett, we find that he was head salesman of the now bankrupt company, in charge of the retail department. He had no other duties and no power, except to sell and contract sales at retail. He says that Arthur Lowrey, the treasurer, ran the business for the last four or five years, and that up to three years ago the president of the company was in the store. One G. L. Ginther was the traveling agent of the Warren Paint Company. In January, 1912, he was at the store of the bankrupt and asked about the financial condition, and on being informed of the bad condition talked of removing the paints. Lowrey had then left the store. Says Bennett:

"After he found no head at the store, he figured about getting out the goods. He claimed they were on consignment. He said he was advised to get the goods out. Q. What was the outcome of his request that he take away the Warren paint goods? He said they were consigned, and I referred him to Mr. Kinne at Lynch & Willis'. He had a talk with them, and they would not let him take them until he could show they were consigned."

This salesman was asked, "Do you know who owned these goods?" This was duly objected to. The objection was overruled, and the witness answered, "Belonged to the Warren Paint Company." This witness did not show himself to be possessed of any information which would qualify him to give an opinion as to the ownership, and he was not a member of the firm. He then stated that he "understood" the agreement between the parties was by way of a written contract; but it is undisputed that the last written agreement was in 1909, and it is not produced. Neither its loss nor destruction was proved by any competent evidence, and the referee finds that in January, 1912, they were not operating under a written agreement.

[1] This question was put to this witness:

Q. (You say) "that the stock of paint then (about November 1st each year) was taken by inventory, and payment was then made to Warren Paint Co.; that is, the proceeds of the sales for the previous year were turned over to the Warren Paint Co., less commission of the Wright-Dana Hardware Co.?"

This was duly objected to and overruled.

"A. Proceeds put in the funds of the store and *consequently* were turned over to the Warren Paint Co."

I assume that "consequently" should be "subsequently." This was leading, suggestive, and called for a conclusion; and, further, other evidence shows that the proceeds of sales were in the main not turned over, but used by the Wright-Dana Company and treated as its own, except in a few cases and under special circumstances.

[2] Returning to the subject of the removal of the goods, the Warren Paint Company was permitted to prove its title by this witness in this way:

"Q. In regard to when Mr. Ginther came to remove these consigned goods, you referred him to Lynch & Willis? A. Yes; to Mr. Lynch. Q. Did he subsequently report to you that he had been advised that this was a consignment and that he was at liberty to remove it? (Objected to by Mr. Martin as incompetent, immaterial. Objection overruled.) A. Yes. Q. He did not offer to remove it until after he had seen Lynch & Willis? (Objected to by Mr. Martin as incompetent, immaterial. Objection overruled.) A. No; not until he was assured that he had a right to. Q. Lynch & Willis were attorneys for the Wright-Dana Hardware Company at that time? A. Yes. Q. Was it a practical thing in your business to keep a separate account of sales made of the Warren paint? (Objected to by Mr. Martin as incompetent, immaterial. Objection overruled.) A. No; it could be done, but would be an awful job."

If, on the day the Wright-Dana Hardware Company was adjudicated a bankrupt, Lynch & Willis were its attorneys, they had no right or power to give away or return this property, or decide the question of its ownership as against this trustee. The question before the referee was not the good faith of Ginther, the agent of the Warren Paint Company, or the good faith of Bennett, the retail salesman of the bankrupt company, in turning over the property in the possession of the Wright-Dana Hardware Company, then adjudicated a bankrupt. What Ginther told Bennett Mr. Lynch, of Lynch & Willis, had told him (Ginther) as to the ownership of the paint, was incompetent and immaterial evidence. The referee seems to have thought otherwise. It was an indirect mode of putting the opinion of Lynch & Willis before the referee, and which opinion, it appears, was based on a writing that has not been found or put in evidence. In view of the ruling of the referee, this evidence was harmful and prejudicial, as well as incompetent.

The evidence of Lowrey on this question does not help the matter. It does not appear from his testimony that he knew what the contract actually was under which the paints in question were sent. If he took part in the arrangement, he should state what its terms were, when made, and who made it. Lowrey says Mr. Clapp, of the Warren Paint Company, the writer of the letters referred to, was in Utica in March, 1911, and that he could recall the matters talked over. He says that the financial condition was not talked over, but does not state what was. He also says Mr.

Clapp and Mr. Dana had some talk, but does not state it. He also says:

"Q. You remember when the last written contract between you and the Warren Paint Company was entered into? A. Do not remember exactly; it happened each year. The last year or two we continued contract which was made, say, at the close of 1909."

Some changes were made, it is conceded. It is true that Lowrey says that since 1910 the Warren Paint Company has requested *him* to purchase these goods (paints) outright, and that he replied that they would not purchase the goods on any terms; "that we did not have the money to put in it, needing all our funds, and that if they insisted upon our purchasing the goods that we should not have to handle them, but that we would continue along consignment lines." Still the real contract may have been as this trustee claims it was, and as the Warren Paint Company wrote it was made by some authorized person representing the now bankrupt company.

The fifth finding of the referee shows that he placed reliance in making his decision as to the ownership of these goods on the advice Lynch & Willis gave Ginther, which is proved only by what Ginther told Bennett, the retail sales agent. There is no proof that Lynch & Willis had any power in the matter, and no legal evidence that they gave the advice or opinion that the agreement then produced constituted a valid and legal consignment. In view of the evidence pro and con on the subject of the ownership of these paints, including the bills and letters, the trustee is entitled to have the question decided on legal evidence.

The order of the referee, allowing the claim and dismissing the petition of the trustee, is reversed, and the matter is sent back for a retrial and rehearing of the question.

So ordered.